UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:  Craig Maike,

        Debtor,

UNITED FINANCIAL CREDIT UNION,

        Appellant,                  Case No. 15-cv-13176

v                                                Honorable Thomas L. Ludington

CRAIG MAIKE, Debtor,

        Appellee.

_____/

**OPINION AND ORDER REVERSING CONFIRMATION OF DEBTOR MAIKE'S PROPOSED CHAPTER 13 PLAN AND REMANDING**

This appeal from the Bankruptcy Court raises questions regarding the interplay of various provisions of the Bankruptcy Code. Debtor-Appellee Craig Maike obtained a loan to purchase his primary residence from Appellant United Financial Credit Union ("UFCU") on March 2, 2007. After falling behind on his mortgage payments, Maike sought Chapter 13 bankruptcy protection in the Eastern District of Michigan on February 10, 2015. Maike then filed his Chapter 13 Bankruptcy plan on February 14, 2015. The plan was not confirmed until August 20, 2015. Pursuant to the plan, the trustee paid $2,910.00 to Maike's attorney, and $234.90 to Appellant UFCU.

UFCU timely filed this appeal, arguing that the plan impermissibly modified its rights as the holder of the security interest in Maike's principal residence in contravention of 11 U.S.C. § 1322(b)(2). Maike disagrees, arguing that the plan reasonably cures his pre-petition and post-petition defaults, and provides payments to UFCU in accordance with 11 U.S.C. § 1322(b)(5).

Maike further argues that the lump-sum priority payment to his attorney was proper under 11 U.S.C. §§ 1326(b)(1), 507(a)(2), 503(b)(2), and 330(a)(4) B), which together create an administrative priority for payment of debtor attorney's fees.

## I.

Debtor Maike entered into a note and mortgage agreement with Appellant UFCU on March 2, 2007. BR. 18-27. Pursuant to that agreement, UFCU lent Maike $62,000, for which UFCU received a security interest in Maike's primary residence and the right to receive interest at the rate of 8.0 percent on any unpaid balance. *Id*. The parties agreed that Maike would make monthly payments in the amount of $454.93. BR. 22. If Maike failed to make such payments as due, he would be in default. BR. 23. UFCU would then have the option to provide Maike notice that failure to correct his default within 30-days would result in acceleration of the balance due on the note. BR. 23.

By 2014 Maike was struggling to make his monthly mortgage payments. Accordingly, on January 24, 2014 Maike and UCFU entered into an agreement modifying the original note. Under the amendment, the monthly principal and interest payment was reduced from $454.93 to $367.36, beginning on February 2, 2014. BR. 25. The parties agreed that Maike was relieved from making the December 2, 2013 and January 2, 2014 payments. *Id*. The parties also agreed to a reduction of the interest rate from 8.0 percent to 5.375 percent, and UFCU agreed to forgive the past due interest amount of $445.30. *Id*. As part of the amendment, Maike acknowledged that as of January 24, 2014 he still owed a principal balance in the amount of $59,754.80. The modification agreement only addressed Maike's default, and did not otherwise affect either party's rights prospectively under the loan agreement.

## A.

On February 10, 2015, after again falling behind in his mortgage payments in the amount of $2,515.90, Maike sought Chapter 13 Bankruptcy protection in the Eastern District of Michigan. The parties do not suggest that UFCU had exercised its right to give Maike notice of default prior to his filing. On Schedule I of his petition, Maike listed an average monthly income of $1,371.00. On Schedule D of his petition Maike listed UFCU as a secured creditor owed $59,300. BR. 39.

Maike then filed his proposed Chapter 13 Bankruptcy plan on February 14, 2015 based on the Eastern District of Michigan model Chapter 13 plan. Maike's proposed plan called for making payments into the plan in the amount of $660.00 per month. Pursuant to the model plan, he proposed paying his attorney fees in full, in the amount of $2,910, before beginning monthly payments in the amount of $510.00 to UFCU. UFCU filed an objection to Maike's plan on April 14, 2015, arguing that the plan impermissibly altered its rights to receive payments each month during the pendency of the plan under 11 U.S.C. §§ 1322(b)(2) and 1322(b)(5). BR. 74.

The initial confirmation hearing took place on April 23, 2015. BR. 133-52. At the hearing, UFCU argued that by allocating all of the plan payments to Maike's attorney's fees prior to payment to UFCU, the plan impermissibly created a post-petition default of Maike's mortgage obligations and altered UFCU's right to receive payments each month in violation of § 1322(b)(2). BR. 135. UFCU noted that this was problematic because Maike's escrow had already been exhausted, and that a negative account would be problematic as tax and insurance payments came due. BR. 136. UFCU further noted that the non-payment was against Maike's interest because the longer he deferred payments on the mortgage debt the more interest would accrue, and the more he would owe in the long-term. *Id.* Finally, UFCU argued that, because the monthly payment under the plan was to be $660.00, there should be enough to pay both the

monthly mortgage payment of $510.00 as well as a monthly payment to Maike's attorney. UFCU noted that under such a scheme Maike's attorney would be paid in full within 24 months. BR. 140.

Maike disagreed, arguing that his attorney fees should be paid first as a priority administrative expense. BR. 137. The Trustee agreed with Maike. The Trustee argued that prioritizing attorney fees over payments to the homestead mortgagee served important policy interests, such as ensuring debtors' ability to obtain and compensate competent counsel. The Trustee further noted that Maike's payment scheme was in line with the Eastern District of Michigan model plan.

Problematic to the confirmation of the plan was the fact that the Trustee had not received sufficient funds from Maike to pay Maike's attorney. Under the plan, the Trustee needed at least three additional months to obtain the $2,910 required to pay Maike's attorney in full. The bankruptcy court was hesitant to confirm the plan before the plan had accumulated enough funds both to pay Maike's attorney in full and to commence monthly payments to UFCU, the homestead mortgagee. At the urging of the Trustee, the bankruptcy court therefore decided to adjourn the confirmation hearing until the Trustee had sufficient funds to pay Maike's attorney in full and begin monthly payments to UFCU, which the bankruptcy court calculated to be in late July. BR. 147-48.

**B.**

Following adjournment of the confirmation hearing, on May 21, 2015 UFCU filed a motion to compel payments under § 1322(b)(2). Reiterating its objections from the April 23, 2015 hearing, UFCU argued that "§1322(b)(2) and §1322(b)(5) act in concert to require regular contractual payments on a mortgage claim during the pendency of the bankruptcy case when a

debtor chooses to treat the mortgage claim pursuant to §1322(b)(5)." At a motion hearing held on July 9, 2015, the bankruptcy court declined to order payments or lift the automatic stay, and reaffirmed its decision to adjourn the confirmation hearing to a time when the Trustee had sufficient funds to pay Maike's attorney in full and begin monthly payments to UFCU. The confirmation hearing was later adjourned to August 20, 2015.

## C.

At the time of the confirmation hearing, the Trustee reported to the bankruptcy court that he had received $3,144.90. Of that, he proposed to pay $2,910 towards Maike's attorney fees under the plan. BR. 182. This left $234.90 available to begin payments to UFCU. *Id*. This was short of the $503.18 that UFCU was ultimately to receive under the plan each month. *Id*. At the hearing, UFCU informed the bankruptcy court that because it had not received payments since Maike's initial Chapter 13 filing in February, it was owed an additional $3,019.18 in post-petition arrearage. BR. 184. It also renewed its objections under §1322(b)(2) and §1322(b)(5). The bankruptcy court took the matter under advisement. BR. 212-14.

On September 3, 2015, the bankruptcy court issued its opinion overruling UFCU's objections and confirming the Chapter 13 Plan. The court concluded that under the plan UFCU would receive its contractual payment of $503.18 each month, that its post-petition arrearage of $3,522.26 would take 28 months to cure, and that its prepetition arrearage of $2,515.90 would then take 20 additional months to cure. BR. 85, 87. The total arrearage owed to UFCU would therefore be cured within the 60 months required under Chapter 13.

In analyzing UFCU's objection, the bankruptcy court noted the tension between § 1322(b)(2), which protects the homestead mortgagee, and § 1326(b)(1), which gives priority to administrative fees, including the debtor's attorney fees. The court then noted that the

Bankruptcy Court for the Eastern District of Michigan had a long tradition of allowing debtors' counsel to receive full priority payment before other creditors and advancing 11 U.S.C. § 1322(b)(5) as authority for allowing a debtor to cure non-payment of post-petition monthly payments, or "gap payments", to all other creditors. The bankruptcy court concluded that the application of § 1322(b)(5) rendered § 1322(b)(2) inapplicable. In finding this reading persuasive, the bankruptcy court noted that most plans involve some form of post-petition default that must be cured as a result of 11 U.S.C. § 1326(a)(1) (requiring debtors to commence making payments within 30 days of the filing of the plan or the order for relief, whichever is earlier). The bankruptcy court also emphasized the importance of providing continuity to bankruptcy practitioners. BR. 92.

On September 4, 2015 the bankruptcy court issued an order confirming Maike's Chapter 13 plan. BR. 99. The trustee was ordered to pay Maike's attorney in full and commence monthly payments to UFCU. *Id*. UFCU then filed a notice of appeal on September 9, 2015. ECF No. 1. After receiving briefs from Appellant and Appellee, as well as amicus briefs from the Michigan Bankers Association, the Northeastern Michigan Bankruptcy Bar Association (the "Bankruptcy Bar"), and the Chapter 13 Trustees for the Eastern District of Michigan (the "Standing Trustees"), this appeal is now ready for decision.

## II.

Final orders of a bankruptcy court are appealable to a federal district court under 28 U.S.C. § 158(a). *In re Gourlay*, 496 B.R. 857, 859 (E.D. Mich. 2013). "Th[is] Court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *Id*. (citing *AMC Mortg. Co. v. Tenn. Dep't of Revenue*, 213 F.3d 917, 920 (6th Cir.2000)).

## III.

Unlike Chapter 7 bankruptcy relief, which allows a debtor a fresh start at the expense of liquidating his or her assets, Chapter 13 allows a debtor to retain his property "if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period." *See Harris v. Viegelahn*, 136 S.Ct. 1829, 1835 (2015) (citing § 1306(b), § 1322, § 1327(b)). Chapter 13 is also distinctive in "the speed expressed by tight deadlines to implement the Chapter 13 plan." *Richard I. Aaron,* BANKR. LAW FUNDAMENTALS § 13.3 (Thomson Reuters, 2015). Under § 1326(a) plan payments should begin within 30 days of the filing of the Chapter 13 petition, unless the Court orders otherwise. Under § 1326(a)(2) such payments by the debtor "shall be retained by the trustee until confirmation or denial of confirmation." Eastern District of Michigan Bankruptcy Local Rule 3070-1 requires all claims to be paid by and through the Chapter 13 trustee "unless the debtor's plan establishes cause for remitting payments on a claim directly to the creditor." Under § 1324(b), "[t]he hearing on confirmation of the plan may be held not earlier than 20 days and not later than 45 days after the date of the meeting of creditors under section 341(a)" unless the court determines that it is in the parties' best interest to hold the hearing earlier. § 1324(b).

**A.**

The debtor's repayment plan is governed by 21 U.S.C. § 1322, which requires "the submission of a portion of the debtor's future earnings and income to the control of a trustee and for supervised payments to creditors over a period not exceeding five years." *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 327 (1993) (citing 11 U.S.C. §§ 1322(a)(1) and 1322(c)). While a plan may modify the rights of holders of most secured claims, § 1322(b)(2) does not allow a plan to modify the rights of "a claim secured only by a security interest in real property that is the debtor's principal residence." *Id*. This provision codifies legislative intent to encourage the flow

of capital into the home lending market. *See Grubbs v. Houston First American Savings Assn.*, 730 F.2d 236, 245–246 (5th Cir. 1984) (canvassing legislative history of Chapter 13 home mortgage provisions).

As explained by the Supreme Court in *Nobleman*, § 1322(b)(2) focuses on the *rights* of the holders of such claims, not just on the claim itself. *See Nobleman*, 508 U.S. at 328-330. Such rights, according to the Supreme Court, are those reflected in the relevant mortgage instruments, and may include "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id*. at 329.

The *Nobleman* Court noted, however, that a homestead mortgagee may still be affected by the mortgagee's Chapter 13 bankruptcy. Specifically, the Court noted that the homestead mortgagee's power to enforce its rights is checked by the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362. *Nobleman*, 508 U.S. at 330. Furthermore, notwithstanding § 1322(b)(2), under § 1322(b)(5) a plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due…" The Court found that this provision applies to "prepetition defaults on a home mortgage". *Nobleman*, 508 U.S. at 330.

Since *Nobleman*, Courts have also found § 1322(b)(5) applicable to post-petition defaults. *See In re Mendoza*, 111 F.3d 1264 (5th Cir. 1997); *In re Hoggle,* 12 F.3d 1008, 1010 (11th Cir. 1994). Specifically, courts have found § 1322(b)(5) applicable to so called "gap-

payments," or those created by the structure of the bankruptcy code itself through § 1326(a), which holds that plan payments should begin 30 days after the filing of a Chapter 13 petition. *See In re Reddick*, 81 B.R. 881, 887 (Bankr .E. D. Mich. 1987). Courts have also found that § 1322(b)(5) allows a debtor to cure a post-petition, post-confirmation default, *Hoggle*, 12 F.3d at 1010 (allowing debtors to cure their post-confirmation default under § 1222(b)(5) after they failed to make post-confirmation payments as required by the plan), and post-petition default caused by the Debtor. *Mendoza*, 111 F.3d at 1265, 1268 (allowing a debtor to use § 1322(b)(5) to cure post-petition arrearage where the debtor lost her job and was unable to make payments after filing her Chapter 13 Petition).

**B.**

In tension with the special protections afforded to the homestead mortgagee is the priority that the Code affords to a debtor's attorney's fees. In individual Chapter 13 cases, "the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section." 11 U.S.C.A. § 330(a)(4)(B). Such attorneys' fees are considered administrative expenses under § 503(b)(2), which, if timely requested, are entitled to priority treatment under § 507(a)(2). Therefore, under § 1326 attorneys' fees must be paid "[b]efore or at the time of each payment to creditors under the plan."

These respective rights of the homestead mortgagee and the debtor's attorney may conflict in cases such as the present one, where the trustee does not have sufficient funds on hand to satisfy both obligations. The question then becomes how the protections afforded to the two creditors should be reconciled under the statute.

### IV.

The parties dispute whether Maike's Chapter 13 plan creates a modification of Appellant UFCU's rights under § 1322(b)(2), and if so, whether that modification is one allowed by § 1322(b)(5). UFCU argues that, by not providing for any payments on the mortgage claim until Maike's attorney fees were paid in full, the plan impermissibly modifies its rights under the mortgage agreement. In his response, Maike argues that the mortgage payment gap is permissible under § 1322(b)(5), which allows for the maintenance and cure of post-petition default. UFCU replies that, while § 1322(b)(5) may allow for the cure of post-petition defaults, it does not allow the plan itself to create a post-petition default by requiring all of the post-petition income to be applied against debtors' attorneys' fees exclusively. UFCU also replies that § 1322(b)(5) requires maintenance payments to be made "while the case is pending."

### A.

Maike first argues that the plan does not actually modify UFCU's rights. As noted above, § 1322(b)(2) prevents a plan from modifying the rights of the homestead mortgagee, which encompasses those rights reflected in the relevant mortgage agreement that are enforceable under state law. *See Nobleman*, 508 U.S. at 329. As explained by the *Nobleman* Court, those rights may include "the right to repayment of the principal *in monthly installments* over a fixed term at specified adjustable rates of interest…." *Id.* (emphasis added).

Here, the mortgage agreement gives UFCU the right to receive payments every month, on the second day of each month. BR. 22. If Maike misses a monthly payment, then UFCU has the option to provide Maike a written notice of default, notifying Maike that failure to cure within 30 days will result in acceleration of the total amount due. BR. 23. Accordingly, by

adjourning the confirmation hearing to permit payment of Maike's attorney fees in full, UFCU's right to receipt of its monthly payments was modified under § 1322(b)(2).

**B.**

Maike argues that, notwithstanding § 1322(b)(2), the plan is confirmable under § 1322(b)(5). That section allows a plan to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due…." *Id*. Maike argues that § 1322(b)(5) allows for cure of post-petition default as well as prepetition default, and that the plan cures his post-petition default to UFCU over a reasonable period of time.

In their amicus brief filed in support of Maike, the Standing Trustees note that most Chapter 13 plans involve some form of automatic post-petition default. The Standing Trustees emphasize § 1326(a)(1), which provides that "[u]nless the court orders otherwise, the debtor shall commence making payments not later than 30 days after the date of the filing of the plan or order for relief, whichever is earlier …."). The Standing Trustees then note that under § 1326(a)(2) such payments by the debtor "shall be retained by the trustee until confirmation or denial of confirmation." They argue, therefore, that under the plain language of the act § 1322(b)(5) must apply to post-petition default.

As noted by UFCU, however, here the post-petition default was created by the plan's requirement that all of Maike's post-petition income be allotted to attorney fees. When that could not be accomplished due to insufficient funds, the court ordered the hearing adjourned so that the plan could acquire enough funds to fully pay Maike's attorney. While it is true that § 1322(b)(5) may allow cure of post-petition default over a reasonable period of time, the language

of that section does not contemplate or authorize a post-petition default created by the plan itself in order to accumulate cash for a preferred creditor – the debtor's attorney. As explained by the Eastern District of Missouri Bankruptcy Court, "[t]he opportunity to cure a default is a shield by which a debtor can heal a delinquent debt. It is not a sword which the debtor can use to further delay payment while the attorney collects a fee." *In re Townsend*, 186 B.R. 248, 249 (Bankr. E.D. Mo. 1994).

*In re Taddeo,* 685 F.2d 24 (2nd Cir. 1982), cited by the Standing Trustees, is distinguishable from the present case. There, after the Taddeos defaulted on their mortgage to Elfriede Di Pierro, Di Pierro accelerated the mortgage, declared its balance due immediately, and initiated foreclosure proceedings. *Id*. at 25. In response, the Taddeos sought Chapter 13 Bankruptcy protection. Di Pierro objected to the Tadeos' plan to cure their default under § 1322(b)(5) and moved for relief from the automatic stay in order to foreclose. *Id*. The bankruptcy court held that the Taddeeos could cure their default and reinstate their mortgage, and the Second Circuit affirmed, holding that Congress intended to allow mortgagors to de-accelerate their mortgage and reinstate its original payment schedule. *Id*. at 26.

In *Taddeo* the debtors themselves were responsible for the post-petition default. Here the plan creates and then extends the delay in payments to the homestead mortgagee.

*Hoggle* and *Mendoza* are also distinguishable. In *Hoggle*, the debtors from three consolidated bankruptcy cases failed to make post-confirmation payments to their homestead mortgagee as required under their Chapter 13 plans. In response, instead of granting the homestead mortgagee's motion for relief from the automatic stay, the bankruptcy court modified the debtors' respective Chapter 13 plans to cure the post confirmation default under § 1322(b)(5). *Hoggle*, 12 F.3d at 1009. As in *Taddeo*, the *Hoggle* debtors were responsible for

their post-petition default. Neither the plan itself nor the bankruptcy court played any role in creating the default or the resulting arrearage. Instead, the bankruptcy court acted to revise the plan to cure the default under §1322(b)(5) once the default occurred.

Similarly, in *Mendoza* the debtor sought Chapter 13 bankruptcy relief, and then lost her job and was unable to make post-petition payments. The bankruptcy court denied the homestead mortgagee's motion for relief from the stay, and allowed the debtor to modify her Chapter 13 plan to extend the number of monthly payments in order to cure the post-petition arrearage resulting from her nonpayment under §1322(b)(5). Again, in *Mendoza* the post-petition default was caused by the debtor, not the plan or the bankruptcy court.

Neither Appellee nor amicus have advanced any Congressional history suggesting that Congress intended § 1322(b)(5) to allow the plan itself to create a post-petition default in payment to the homestead mortgagee, thereby circumventing the protections expressly provided to that creditor under § 1322(a)(2). Appellee and amicus also do not explain where Congress evidenced an intent for § 1322(b)(5) to allow a bankruptcy court to delay confirmation of the plan – thereby delaying payments to the homestead mortgagee in contravention of § 1322(b)(2) – in order to accumulate funds to pay the debtor's attorney. Such delays are not authorized under §§ 1322(b)(2) and 1322(b)(5), and they conflict with the Act's emphasis on tight deadlines and speedy resolution of Chapter 13 plans. Such delays are also inconsistent with § 1324(b), which provides that a Chapter 13 confirmation hearing may be held "not earlier than 20 days and *not later than 45 days* after the date of the meeting of creditors under section 341(a) unless the court determines that it would be in the best interests of the creditors and the estate to hold such hearing at an *earlier date*…." *Id*. (emphasis added).

While post-confirmation default in Chapter 13 cases resulting from the timing provisions of the code or from defaults in payments by the debtor may often be inevitable, and curable under § 1322(b)(5), it does not follow that § 1322(b)(5) allows a Chapter 13 plan to intentionally modify the homestead mortgagee's right to receive payment each month in contravention of § 1322(b)(2). Section 1322(b)(5) exists as a mechanism to cure defaults and maintain payments while a bankruptcy case is pending – it does not exist to allow the plan itself to create defaults at the expense of the homestead mortgagee in order to prioritize payment to debtor's counsel, exclusively.

### C.

Maike next argues that § 1322(b)(2) and (b)(5) must give way to the priority the code affords to his attorney under §§ 1326(b)(1), 507(a)(2), 503(b)(2), and 330(a)(4) B. As explained by the Western District of Michigan Bankruptcy Court, however, "unlike section 1322(b)(2), section 1326(b)(1) is not so absolute. Instead, administrative expenses may be paid *first or concurrently*. In other words, nothing in section 1326(b)(1) requires that attorneys' fees be paid first." *In re Hammon*, WL 4462179, at *3 (Bankr. W.D. Mich. July 21, 2015) (citations omitted). *See also In re Lanigan*, 101 B.R. 530, 532–33 (Bankr. N.D.Ill. 1986) (holding that section 1326(b)(1) does not require payment in full of attorneys' fees before payment to other creditors; rather, attorneys should share in risk of plan failure); *In re Collins*, 2007 WL 2116416, at *12 (Bankr. E.D. Tenn. July 19, 2007) (plan proposing to defer payment to residential mortgage holder until all attorneys' fees paid violated section 1322(b)(2) and finding that section 1326(b)(1) does not require payment of administrative expenses ahead of other claims).

Maike advances *In re Harris*, 304 B.R. 751 (Bankr. E.D. Mich. 2004) for the proposition that payments to the homestead mortgagee give way to payments to the debtor's attorneys under

§ 1326(b)(1) unless the debtor's counsel agrees to delay the receipt of payment. *Harris* is materially distinguishable from the present case. In *Harris* the secured creditors were not homestead mortgagees entitled to the special protections of § 1322(b)(2). Instead, they held a secured interest in the debtor's vehicle, and thus were secured creditors whose rights were subject to modification under § 1322(b)(2). The holding in *Harris* that attorney's fees should be paid first under the confirmed Chapter 13 plan is not applicable to the present case, where the objecting creditor has special protections under the plain language of the Code.

As explained in *Townsend*, "[p]ayment of attorney fees cannot usurp the obligation to provide equal monthly payments beginning with the first disbursement under the plan." *Id*. at 249. Because § 1326(b)(1) requires only that the debtor's attorney be paid concurrently with other creditors, the debtor's attorney may not be paid in full at the expense of the homestead mortgagee. Here, there were sufficient funds to allow the debtor's attorney to receive installment payments concurrently with the installment payments being paid to UFCU.

**D.**

Finally, Maike argues that the plan should be upheld because it is in line with the Eastern District of Michigan model code. Maike and amicus stress the importance of providing continuity to bankruptcy practitioners and trustees. They also emphasize the important role that full payment to debtors' attorneys plays in ensuring that debtors have access to competent counsel in bankruptcy proceedings, and argue that delaying payment to debtors' attorneys may discourage the pursuit Chapter 13 relief.

While Maike and amicus are correct that payment to debtors' attorneys at the outset of the plan encourages competent representation, the language Congress chose for the bankruptcy code does not codify such a policy. Appellees have not pointed to any language in the code,

legislative history, or binding court rulings that evidence a Congressional intent that debtor's attorneys be paid in full at the outset, even at the expense of the homestead mortgagee. While Congress choose language that provided some protections to the debtor's attorney fees in the form of administrative priority, such protections do not override Congress's codified policy of protecting the rights of the homestead mortgagee. Similarly, while bankruptcy practitioners and trustees should have the benefit of model plans and standardized practices, plans and practices must conform to the Bankruptcy code. Concern for debtor's attorneys cannot override the express language of § 1322(b)(2) and § 1322(b)(5).

While this opinion may be disruptive to the Eastern District of Michigan model Chapter 13 plan, it is limited in its consequence. First, issues addressed in this opinion only arise where there is a homestead mortgagee under § 1322(b)(2). More importantly, issues addressed in this opinion are limited to the circumstances where the plan has insufficient funds on hand to pay the debtor's attorney in full and to make an initial payment to the homestead mortgagee. Finally, this is but a court of first impression, with no Circuit authority to address.

**V.**

When faced with the debtor's proposed plan to pay his attorney in full before paying the homestead mortgagee, the bankruptcy court had three options. First, the bankruptcy court could have approved the plan at the initial June confirmation hearing. This option would have impermissibly violated the homestead mortgagee's rights under § 1322(b)(2) and §1322(b)(5), since UFCU could not have received any payments during the initial months of the plan when all funds would have been directed to Maike's attorney. The second option, which the bankruptcy court chose, was to adjourn the confirmation hearing until the trustee had received enough funds to pay the debtor's attorney in full and disburse a monthly payment to the homestead mortgagee.

In doing so, the bankruptcy court created a $3,019.18 post-petition default at the expense of the homestead mortgagee – a protected creditor under § 1322(b)(2) – in order to accumulate funds for a different creditor. The plan-created arrearage was also at the expense of the debtor himself, who accumulated further interest on his unpaid mortgage principal.

The bankruptcy court's third option was to deny confirmation of the plan. Because the third option was the only permissible option under the bankruptcy code, the decision of the bankruptcy court is **REVERSED** and the case is **REMANDED** for proceedings consistent with this opinion.

          s/Thomas L. Ludington
          THOMAS L. LUDINGTON
          United States District Judge

Dated: April 7, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 7, 2016.

          s/Michael A. Sian
          MICHAEL A. SIAN, Case Manager